# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

        Debtor.

Case No. **09-60452-7**

# MEMORANDUM of DECISION

At Butte in said District this 23rd day of February, 2010.

In this Chapter 7 bankruptcy, after due notice, a hearing was held January 29, 2010, in

Missoula on the Chapter 7 Trustee's:

> MOTION OF CHAPTER 7 TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a),
> 363(b), 363(f) AND 365, AND FED. R. BANKR. P. 2002(a)(2), 6004 AND 6006
> FOR ORDER (A) APPROVING THE SALE OF REAL PROPERTY KNOWN
> AS "FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB" FREE
> AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B)
> APPROVING BIDDING PROCEDURES AND AUTHORIZING THE
> TRUSTEE TO SOLICIT HIGHER AND BETTER OFFERS PURSUANT TO
> PROPOSED NOTICE OF SALE, (C) GRANTING RELIEF FROM STAY ON
> THE FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB AND
> ON PROPERTY LOCATED AT 18 KING EDWARD COURT, RANCHO
> MIRAGE, CALIFORNIA AND (D) GRANTING RELATED RELIEF

filed December 18, 2009, at docket entry no. 576, together with the objections thereto filed by:

Marc S. Kirschner, as Trustee (the "Yellowstone Trustee") of the Yellowstone Club Liquidating

Trust ("YCLT"); Western Capital Partners, LLC; and Greg LeMond, David and Sacia Morris and

Sacia Enterprises, Inc. (the "LeMond Group"). The Chapter 7 Trustee, Richard J. Samson, who

appeared personally at the hearing and testified, was represented by David B. Cotner of Missoula,

1

Montana.  In addition, YCLT was represented at the hearing by Charles W. Hingle of Billings, Montana, Western Capital Partners was represented by Robert W. Hatch, II of Denver, Colorado, the LeMond Group was represented at the hearing by K. John Shaffer of Los Angeles, California and James J. Screnar of Bozeman, Montana, and CIP Yellowstone Lending, LLC ("CIP") was represented by Paul D. Moore and Barry D. Green of Boston, Massachusetts and Benjamin P. Hursh of Missoula, Montana.  The Trustee's Exhibits 2 through 13, CIP's Exhibit 1 and the LeMond Group's Exhibits 14 and 16 were admitted into evidence.

In a footnote, YCLT states that it "will ask the Court to take notice of the testimony on value and entitlements for the Family Compound during the hearing on the motion for relief from the automatic stay held October 2, 8 and 9, 2009, in the BLX Case."  Given the inter-relatedness of this case to the other Blixseth entity bankruptcies and associated proceedings, this Court deems it appropriate to take judicial notice of the proceedings in the BLX bankruptcy and the Yellowstone Club entities' bankruptcies.

## BACKGROUND

Timothy L. Blixseth ("Blixseth") and his former spouse, Edra Blixseth ("Debtor"), were the founders of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, which limited liability companies are referred to generally by this Court as the Yellowstone Club entities.  Blixseth and Debtor were also the founders of Yellowstone Club World, LLC ("YCW"), Big Springs Realty, LLC ("BSR") and BLX Group, Inc., f/k/a Blixseth Group, Inc. or BGI.  Blixseth and Debtor separated sometime in 2006 and Blixseth retained sole control of BGI, YCW, BSR and the Yellowstone Club entities from 2006 until August of 2008, when Debtor was awarded BGI,

2

Created by Neevia Document Converter trial version http://www.neevia.com

YCW, BSR and the Yellowstone Club entities as part of a marital settlement agreement. Debtor, on August 19, 2008, changed the name of BGI to BLX Group, Inc. ("BLX"). Also, in August of 2008, Debtor, at the suggestion of Samuel T. Byrne ("Byrne") and CrossHarbor Capital Partners ("CrossHarbor"), hired Discovery Land Company to manage and oversee the Yellowstone Club's operations, administration, design, construction, completion, maintenance, marketing, sales and all other day-to-day functions.

Under the marital settlement agreement between Debtor and Blixseth, Debtor was required to make various payments to or on behalf of Blixseth. To allow for Debtor to make such payments, CIP, on or about August 13, 2008, granted Debtor and BLX a 45-day loan in the original principal amount of $35 million (the "CIP Loan").[1]  The CIP Loan was evidenced by two notes:

    1.  A Promissory Note in the principal sum of $13,000,000.00 made by BLX and Debtor to CIP; and

    2.  A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Debtor to CIP.

The CIP Loan is secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "CIP Deed of Trust") granted by the Debtor and BLX which purportedly encumbers property commonly known as 42765 Dunes View Road, Rancho Mirage, California (the "Porcupine Creek Property"), as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property and commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California. The

---

[1]  According to the Real Estate Purchase Agreement attached to the Trustee's Motion, the current amount owed CIP on the $35 million loan is at least $44,607,892 as of November 30, 2009.

Created by Neevia Document Converter trial version http://www.neevia.com

Porcupine Creek property is owned by BLX.  An appraiser, Raymond L. Dozier, appraised the Porcupine Creek property at roughly $195,000,000 in October of 2007 and $128,000,000 in January of 2009.  In a memorandum of decision entered by this Court on October 2, 2009, in the BLX bankruptcy, the Court concluded that the "as is" impaired value of Porcupine Creek is currently $73,500,000.  In that same memorandum of decision and related order, the Court granted CIP relief from the automatic stay as to the two single family homes commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California.

The CIP Loan is also secured by real property commonly referred to as the 160-acre Blixseth Family compound ("Family Compound").  The 160-acre Family Compound is the subject of this Motion.

Of the $35 million CIP Loan, CIP retained $13,094,973.33 to payoff a loan that Blixseth and Kawish, LLC (an entity belonging to Blixseth) owed to CIP.  CIP also retained $225,000 for closing costs and $28,000.00 for pre-closing interest.  In addition, cash was paid out as follows:

| | |
|---|---|
| Title Insurance Premium/Costs | $102,012.80 |
| LeMond Title Insurance Premium/Costs | $13,540.00 |
| Owner's Policy Title Insurance Premium/Cost | $7,834.00 |
| LeMond Payment (wired directly to LeMond) | $8,000,000.00 |
| California Property Tax | $624,763.00 |
| Tim Blixseth Payment (wired directly to Blixseth) | $4,944,396.17 |
| Archer Financing Fee (wired directly to Archer Capital) | $200,000.00 |
| Borrower Proceeds | $1,016,477.28 |
| Commerce Escrow Fee | $18,000.00 |
| Federal Tax Lien | $2,176,779.22 |
| Borrower Counsel Fee | $500,000.00 |

Shortly thereafter, on November 10, 2008, Debtor caused the Yellowstone Club entities

4

Created by Neevia Document Converter trial version http://www.neevia.com

to seek protection under Chapter 11 of the Bankruptcy Code.[2]  Pursuant to the Yellowstone Club entities' confirmed Chapter 11 plan, YCLT is the successor-in-interest to Yellowstone Mountain Club, LLC and Yellowstone Development, LLC.

The Yellowstone Club entities comprise what is commonly referred to as the Yellowstone Club, an exclusive 13,000 acre plus master-planned residential and recreational community/retreat for members-only that targets individuals with high net worth.  Byrne is the founder and managing member of CrossHarbor and is also a principal and co-founder of CIP and New CH YMC Acquisition, LLC.  Byrne is also a member of the Yellowstone Club and both Byrne and CrossHarbor own substantial property within the Yellowstone Club.[3]  In addition, CIP was the entity that eventually provided the Yellowstone Club entities with $19,750,000 of debtor-in-possession financing, and New CH YMC Acquisition, LLC acquired the bulk of the Yellowstone Club entities assets for $115 million in 2009 and is operating as the Reorganized Debtors.[4]

---

[2]  Evidence in other cases suggests that Byrne proposed to Blixseth in the summer of 2008 that the Yellowstone Club entities file a "pre-packaged" bankruptcy to escape some of its financial difficulties.  Thus, it appears that the bankruptcy filings on behalf of the Yellowstone Club entities may have been in the works for some time.

[3]  Byrne purchased two Yellowstone Club lots in 2005.  Byrne then made a bulk purchase in the Yellowstone Club in 2006 by taking over the 58 unit Sunrise Ridge Condominium Development for a price of $60 million.  In August of 2007, Byrne purchased an additional 31 lots on the Yellowstone Club golf course at a price of $54 million.

[4]  In approximately March of 2008, Byrne, through CrossHarbor, was proposing to purchase the assets of the Yellowstone Club for approximately $407 million.  Byrne testified in other proceedings that his willingness to purchase the Yellowstone Club for approximately $407 million was based upon months of due diligence wherein Byrne and CrossHarbor spent millions of dollars.  The proposed 2008 asset sale fell through, according to Byrne, for various reasons, including Blixseth's inability to accurately determine all the Yellowstone Club's liabilities and because  Blixseth would have had to pay money to close the sales transaction as the Yellowstone

Created by Neevia Document Converter trial version http://www.neevia.com

In addition, an involuntary bankruptcy petition was filed against YCW on January 25, 2009 (Case No. 09-60061), BSR filed a voluntary Chapter 7 bankruptcy petition on June 5, 2009 (Case No. 09-61079), and an involuntary Chapter 11 bankruptcy petition was filed against BLX on September 21, 2009 (Case No. 09-61893). Debtor filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009. Debtor's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Richard J. Samson was appointed the Chapter 7 Trustee.

Debtor filed her Summary of Schedules, Schedules and Statement of Financial Affairs on April 29, 2009. Debtor's Summary of Schedules reflects that Debtor's assets have a total value of $106,981,315.00, while Debtor's liabilities total $157,720.567.07. With respect to real property, Debtor's Amended Schedule A filed June 12, 2009, identifies the following:

| Description of Property | Current value | Amount of secured claim |
|---|---|---|
| 185 ANDESITE RIDGE ROAD, BIG SKY, MONTANA.  MORE PARTICULARLY DESCRIBED AS FOLLOWS:  LOT 48, OF YELLOWSTONE MOUNTAIN CLUB SUBDIVISION, PHASES 1 AND 2, IN MADISON COUNTY, MONTANA, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER, MADISON COUNTY, MONTANA. (PLAT REFERENCE IN BOOK 4 OF PLATS, PAGE 408, RECORDS OF MADISON COUNTY, MONTANA) | $7,200,000.00 | $6,199,418.07 |

---

Club's liabilities exceeded its assets.  In the Yellowstone Club entities' bankruptcy, CrossHarbor proposed a stalking horse bid of $100 million under circumstances that provided fairly generous protections to CrossHarbor if it was not the successful bidder, including  a $2.0 million breakup or termination fee, plus actual expenses up to $1.0 million incurred subsequent to November 10, 2008.  In the Yellowstone Club bankruptcies, CrossHarbor sagaciously positioned itself to purchase the Yellowstone Club at a price that was drastically less than what it was willing to pay for the Yellowstone Club only 12 to 24 months prior.  The only other party seriously interested in bidding on the Yellowstone Club was the first position lien creditor, Credit Suisse.  In the end, CrossHarbor acquired the Yellowstone Club for $115 million–a mere 28% of what it originally agreed to pay for the Yellowstone Club in 2008 following extensive due diligence.

6

Created by Neevia Document Converter trial version http://www.neevia.com

| | | |
|---|---|---|
| FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB PHASE 1 & 2, SECTION 7, TOWNSHIP 7 SOUTH, RANGE 3 EAST, LOT 1A, AMENDED COS 7/1544, MADISON COUNTY, MONTANA (2 SMALL GUEST CABINS AND 160 ACRES) | $20,000,000.00 | $20,000,000.00 |
| 18 KING EDWARD COURT, RANCHO, MIRAGE, CA | $650,000.00 | $650,000.00 |
| CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, #2304, BELLEVUE, WA | $2,000,000.00 | $2,000,000.00 |
| CONDOMINIUM LOCATED AT 76620 HOLLYHOCK DRIVE, PALM VALLEY, CA | $150,000.00 | $150,000.00 |
| 42391 RANCHO LAS PALMAS, UNIT 23, RANCHO MIRAGE, CA | $100,000.00 | $100,000.00 |
| 71361 GARDESS ROAD, RANCHO MIRAGE, CA PROPERTY IS OWNED BY TIM BLIXSETH AND EDRA BLIXSETH AS JOINT TENANTS | $375,000.00 | $375,000.00 |
| 71621 GARDESS ROAD, RANCHO MIRAGE, CA | $300,000.00 | $300,000.00 |

On July 16, 2009, creditor One Lincoln Tower was granted relief from the automatic stay to proceed against Debtor's "CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, #2304, BELLEVUE, WA" and on October 26, 2009, Western Capital Partners was granted relief from the automatic stay with respect to the same property.  Thereafter, on November 5, 2009, the Court entered an Order authorizing the Chapter 7 Trustee to sell the Bellevue condominium.

The Family Compound is relatively flat, developable land situated in the heart of the Yellowstone Club, between the lodge area and the golf course.  Improvements on the Family Compound include a residential unit with an attached guest house.  In approximately April of 2008, while Blixseth owned the Family Compound, CrossHarbor secured preliminary plat approval from the Madison County Board of Commissioners for 40 development units at the Family Compound.  CrossHarbor's efforts in obtaining final plat approval of 40 development units were made in conjunction with CrossHarbor's efforts to purchase the Family Compound

7

Created by Neevia Document Converter trial version http://www.neevia.com

from Blixseth for $56 million in as late as June of 2008.  CIP did not inform the Trustee of its

prior agreement with Blixseth to purchase the Family Compound.  The Trustee testified that he

only learned of the prior purchase agreement between CrossHarbor and Blixseth during

discussions with Blixseth in July or August of 2009.  The Trustee later learned more about the

prior purchase agreement when the LeMond Group raised the matter in their objection to the

Trustee's pending Motion.  To date, none of the parties have secured final plat approval for the

40 development units.

  The Trustee states that the Family Compound is allegedly subject to a variety of liens and

encumbrances that total in excess of $48.5 million.  The Trustee's Exhibit 2 is a schedule from a

title report.  Exception 5 is the $56 million Purchase and Sale Agreement between Blixseth and

CIP dated August 28, 2007.  Exception 6 is $13 million of the CIP Loan, exception 7 is an

obligation owed to the LeMond Group, exception 8 is the other $22 million of the CIP Loan.

Western Capital Partners, LLC, does not have a secured interest in the Family Compound, but is

an unsecured creditor of Debtor's estate.

  The Trustee did an initial evaluation of the Family Compound, including the three major

liens of CIP and the LeMond Group.  The Trustee testified that he had a hard time determining

the value of the Family Compound because of the real estate market decline in 2008.  In

approximately July of 2009, the Trustee commenced discussions with CrossHarbor and the

Yellowstone Trustee about the Family Compound.  Those discussions broke down in August of

2009, but the Trustee again renewed the discussions with CIP in September of 2009.  In

approximately October of 2009, the Trustee and CIP reached a "verbal agreement" whereby CIP

agreed to purchase the Family Compound from the Trustee.  That verbal agreement is the basis

Created by Neevia Document Converter trial version http://www.neevia.com

for the Motion before the Court today.

Debtor's bankruptcy estate is not generating any income and the Trustee has not been able to liquidate any assets for the benefit of the estate.  Thus, the Trustee does not have any money to pay for an appraisal of the Family Compound.  However, CIP had an appraisal of the Family Compound done in June or July of 2009.  Based upon discussions with CIP and after reviewing CIP's appraisal, which CIP made available to the Trustee, the Trustee believes that the Family Compound is worth approximately $8 million.

CIP proposes to be a stalking horse bidder for the sale of the Family Compound under the terms set forth in the Real Estate Purchase Agreement filed December 18, 2009, at docket entry no. 576.  CIP's stalking horse bid of $8.5 million consists of an $8 million credit bid and a $500,000 cash carve-out.[5]  The $500,000 is intended, in part, to reimburse the estate for its time and effort in facilitating a sale of the Family Compound.  As explained by the Trustee, CIP has agreed to pay $500,000 in exchange for the Trustee's accommodation to sell the property free and clear of liens.  Under a sale free and clear of liens, CIP could move forward without having to go through State court foreclosure proceedings, thus eliminating any rights of redemption that other parties may have.

The $500,000 is also an accommodation for the Trustee's release of all claims against CIP.  The Trustee's Motion, which was drafted in large part by CIP, provides in paragraphs 15

---

[5]  Under the terms of the Real Estate Purchase Agreement, the term "Carve-out' "means five hundred thousand United States Dollars ($500,000.00), which constitutes that portion of the Purchase Price which: (1) Buyer shall not be permitted to include in its Credit Bid; and (2) will not be subject to the Liens."  The terms "Liens" is defined as "all of [CIP's] duly perfected security and mortgage interests in the Property arising under or in connection with the Loan Documents."

Created by Neevia Document Converter trial version http://www.neevia.com

and 16:

> 15. In consideration of CIP joining in this Motion and agreeing to the Real Estate Purchase Agreement and providing a Carve-out for the benefit of the Debtor's estate, the Trustee acknowledges and agrees that the Loan and all the liens created thereby are valid, legal, binding and enforceable obligations of the Debtor; that there are no defenses, offsets, or counterclaims of any kind with respect thereto; that as of November 30, 2009, the amount outstanding under the Loan was $44,607,892 and that interest at the rate of 15% was accruing thereon; no portion of the Loan is subject to avoidance, recharacterization, recovery, subordination or other challenge under the Bankruptcy Code, other applicable law or otherwise; and that the liens and security interests granted under the Loan Documents are perfected, enforceable first priority liens on and security interests in the collateral (other than the Third Mortgage and Security Agreement, which is a perfected, enforceable third priority lien on and security interest in the collateral) and are not subject to avoidance, recharacterization, subordination or other challenge. Further, the Trustee hereby releases CIP from all claims, rights, damages and causes of action arising on or before the date hereof relating in any way to the Loan, the Property or the Loan Documents.

> 16. Trustee acknowledges, and agrees not to object to, contest, or otherwise challenge, or support the challenge of, the amount, validity, perfection, priority and/or enforceability of (I) the Loan, (ii) the Loan Documents, (iii) any of CIP's security and/or mortgage interests in the Property and/or any other collateral granted under or in connection with the Loan Documents and/or (iv) the Obligations.

The Trustee testified that at the time he reached a verbal agreement with CIP in October of 2009, release of all claims was not part of the deal.  The Trustee did not learn of the release issue until sometime in November of 2009 when CIP provided the Trustee with the first draft of the Real Estate Purchase Agreement.

When the Trustee first learned that CIP wanted him to release all claims against CIP, the Trustee undertook "a close scrutiny of the background of all the information – the notes, everything that transpired – that led to the liens on the Family Compound that were held by CIP[.]"  According to the Trustee, he looked at whether CIP's liens against the Family

10

Created by Neevia Document Converter trial version http://www.neevia.com

Compound were avoidable transfers.  The Trustee testified that he also examined other possible and potential claims, but did not identify the nature of the other claims examined.  The Trustee concluded that funds of at least $26 million of the $35 million loan were used by Debtor for her personal benefit based on obligations that she assumed under her marital settlement agreement with Blixseth.  The Trustee thus ascribed no value to the releases.

Under the proposed Notice of Sale, any competing bid to CIP's stalking horse bid had to be no less than $9,000,000.00 to cover the $8 million credit bid, the $500,000 carve-out, $250,000 for a termination fee to CIP, plus all out of pocket expenses incurred by CIP in pursuing the acquisition of the Family Compound not to exceed the sum of $150,000 in the aggregate.  CIP agreed at the hearing to waive the $250,000 termination fee, and thus any competing bid would now be $8,750,000.00.

The Trustee seeks to limit service of his pending Motion and Notice of Sale to:

the Debtor, the Debtor's twenty largest unsecured creditors, the Office of the United States Trustee, all parties who are known to the Debtor to claim interest in or liens upon the California Property and all parties having filed notices of appearance pursuant to Fed. R. Bankr. P. 2002. The Trustee will cause the Notice of Sale to be served upon all of the foregoing entities; all parties who are known to the Debtor to claim interests in or liens upon the Property; all governmental units, including taxing authorities who have, or as a result of the sale of the Property may have, claims, contingent or otherwise, against the Debtor in connection with the Debtor's ownership of the Property; all creditors; and all entities that have expressed to the Trustee an interest in purchasing the Property.

The Trustee explained that he has not attempted to market the property because he does not believe the Debtor has any equity in the Family Compound.  The Trustee also has no plans to market the property going forward or to retain a real estate broker and has no plans to advertise the Family Compound.  The Trustee believes that the only persons interested in the Family

11

Compound are those parties involved in this case.

The Trustee contends that an immediate sale is necessary because of the ongoing expense to the estate of keeping the property. For instance, the Trustee has not been able to pay the real property taxes on the property. The Trustee is similarly financially unable to insure the structures on the Family Compound. However, CIP has the two dwellings on the property insured at a value of $2 million. The Trustee also testified that the estate is incurring ongoing monthly bills of $750.00 to $1,000.00 for heat and snow removal at the Family Compound. The Trustee, however, conceded that he is not paying the monthly costs out of pocket as those are costs that can be surcharged against the property under 11 U.S.C. § 506(c). The Trustee summarily concluded that he does not see any potential of selling the property for a sum in excess of the three major liens because he has "not been contacted or had any communication from anyone with an interest in purchasing the property[.]"

## CONTENTIONS of the PARTIES

In the pending matter, the Trustee requests entry of two orders: (1) a Procedures Order, (i) approving notice of the Bid Procedures Hearing and the matters heard and considered by the Court therein as proper, timely, adequate and sufficient notice under the circumstances; (ii) approving and authorizing the execution and delivery of the Real Estate Purchase Agreement, including, without limitation the acknowledgment by the Trustee of the validity, priority and perfection of the liens granted pursuant to the Loan Documents and the right of the Buyer to credit bid, subject to higher and better offers; (iii) approving the Notice of Sale, including approving the bidding and sale procedures (the "Bid Procedures"); (iv) granting CIP relief from the automatic stay to pursue its rights and remedies under the Loan Documents and applicable

12

Created by Neevia Document Converter trial version http://www.neevia.com

non-bankruptcy law as to the Family Compound in the event one or more Foreclosure Trigger Events occurs; and (v) granting CIP relief from the automatic stay to immediately pursue its rights and remedies under the Loan Documents and applicable non-bankruptcy law as to the California Property; and (2) a Sale Order, (i) approving notice of the proposed sale of the Family Compound, the bidding procedures, the objection period and the Sale Hearing as proper, timely, adequate and sufficient notice under the circumstances; and (ii) approving and authorizing the proposed sale of the Property to the Buyer or other Successful Bidder pursuant to the Bidding Procedures.

While the Trustee states that his is not seeking final approval of a sale to a particular purchaser at this time, the Trustee requests that the Court ratify "the validity, priority and perfection of" CIP's $35 million loan and grant CIP the right to credit bid up to the amount of its "allowed claim of $15,652,139.26 as of November 30, 2009, with interest continuing to accrue on said amount at a rate of fifteen percent (15%) per annum, as well as accrued and accruing costs and expenses of collection, including attorneys' fees." The bidding procedures require overbids of $500,000 and provide for reimbursement of CIP's fees and costs up to $150,000.[6] The Trustee contends that approval of the sale is appropriate because "[n]o one other than CIP, has expressed any interest in acquiring the Family Compound, nor has the Trustee had the ability to pay any of its related accrued expenses, including real estate taxes, homeowners association fees or costs of maintenance of the Family Compound." The Trustee argues that a sale of the property at a price of $8.5 million (subject to higher and better offers at auction) will maximize

---

[6] The bidding procedures also provided for a breakup fee of $250,000 to CIP in the event it is not the successful bidder. However, as previously discussed in this Memorandum of Decision, counsel for CIP agreed at the hearing to waive the breakup fee.

Created by Neevia Document Converter trial version http://www.neevia.com

the proceeds received by the bankruptcy estate.  The Trustee asserts that the sale, under procedures that the Trustee maintains are intended to enhance competitive bidding, is fair, even though the Trustee has not exposed the property to the market.  The Trustee has also not obtained an independent appraisal of the property.  Rather, the Trustee relies solely on CIP's opinion of value, including an appraisal of the subject property provided by CIP to the Trustee.  If the Trustee is not permitted to sell the Family Compound under the above provisions, he states that his alternative is to abandon the property.

Western Capital Partners, a creditor in this case, opposes the Trustee's motion arguing that CIP is surreptitiously attempting to obtain judicial approval CIP's $35 million loan to Debtor, even though the validity of such loan is the subject of dispute before this Court.  In addition, because the Trustee is agreeing to waive any claims the Debtor's estate may have against CIP, Western Capital Partners seeks, by way of its Amended Objection, authority to pursue a Uniform Fraudulent Transfer Act against CIP relative to the $35 million loan.

The LeMond Group opposes the Trustee's Motion arguing that CIP's stalking horse bid of $8.5 million is unreasonably low, particularly when CIP was willing to pay $56 million for the property as late as June 30, 2008.  The LeMond Group also argues that CIP does not need a breakup fee because CIP needs no additional incentive to bid on the Family Compound.  The LeMond Group's latter objection is moot given CIP's oral wavier of the breakup fee at the hearing.

Next, the LeMond Group argues that the Trustee's proposed bid procedures do not encourage competitive bidding because: (1) the Real Estate Purchase Agreement, which is in excess of 20 pages, is unduly complicated; (2) bids are due on January 22, 2010, which is just

14

Created by Neevia Document Converter trial version http://www.neevia.com

over one month after the Trustee filed his Motion; (3) bids and deposits are due prior to the January 29, 2010, hearing on approval of the bid procedures; (4) the Trustee has made no attempt to market the property; and (5) a foreclosure proceeding in state court is more beneficial to junior lienholders, such as the LeMond Group, as opposed to the Trustee's proposed sale. The Trustee's Notice of Errata filed January 25, 2010, includes an amended version of the Notice of Sale. The Trustee's amended Notice of Sale removes the dates that give rise to the LeMond Group's second and third objections discussed above. The Trustee's amended Notice of Sale renders the LeMond Group's second and third objections to the Trustee's proposed bidding procedures moot. Finally, the LeMond Group argues that under *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008), the Trustee cannot sell, pursuant to 11 U.S.C. § 363(f), the Family Compound free and clear of liens over the objection of junior lienholders such as the LeMond Group.

Similar to the LeMond Group, YCLT argues that the Trustee's proposed sales price of $8.5 million is improvident and does not approximate the true value of the Family Compound. YCLT also argues that the Trustee unfairly proposes a quick sale of the Family Compound with no marketing plan. Finally, YCLT also argues that the Trustee cannot sell the Family Compound over the objections of junior lienholders under *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008).

JURISDICTION

This is a core proceeding within this Court's jurisdiction. 28 U.S.C. §§ 1334(a), and 157(a) and (b)(2)(A), and (M). According to the parties, at issue is whether § 363(f) permits a sale free and clear of liens when the sale price is insufficient to satisfy all liens.

15

Created by Neevia Document Converter trial version http://www.neevia.com

DISCUSSION

Pursuant to 11 U.S.C. § 363(b), a trustee of a liquidating case under Chapter 7 of the

Bankruptcy Code has statutory authority to sell, other than in the ordinary course of business, the

estate's property free and clear of any liens, claims, or encumbrances against the property so long

as evidence is presented which meets any one of the five conditions listed in 11 U.S.C. § 363(f),

together with the judicially created sale condition that the purchaser of the property be found to

have acted in "good faith" throughout the sale process.  The relevant portions of 11 U.S.C. §

363(f) provide as follows:

> (f) The trustee may sell property under subsection (b) ... of this section free and
> clear of any interest in such property of an entity other than the estate, only if–
>
> > (1) applicable nonbankruptcy law permits sale of such property free and
> > clear of such interest;
> > (2) such entity consents;
> > (3) such interest is a lien and the price at which such property is to be sold
> > is greater than the aggregate value of all liens on such property;
> > (4) such interest is in bona fide dispute; or
> > (5) such entity could be compelled, in a legal or equitable proceeding, to
> > accept a money satisfaction of such interest.

In his Motion, the Trustee summarily argues that if CIP were to foreclose upon its

interests in the Family Compound, applicable nonbankruptcy law would permit the sale of the

Family Compound free and clear of other interests, such as the LeMond Group's, and therefore,

the Trustee may sell the Family Compound free and clear of such interests under 11 U.S.C. §§

363(f)(1) and (f)(5).  After attacking the purchase price and the Trustee's proposed bidding

procedures, YCLT and the LeMond Group, relying on *Clear Channel Outdoor, Inc. v. Knupfer*

*(In re PW, LLC)*, 391 B.R. 25 (9th Cir. BAP 2008), argue that the Trustee cannot sell the Family

Compound without the consent of junior lienholders.  Western Capital Partners does not take

16

Created by Neevia Document Converter trial version http://www.neevia.com

issue with the sale of the Family Compound per se, but rather, wants the waivers and releases stricken from the Purchase and Sale Agreement and, because the Trustee is not willing to pursue a possible UFTA claim against CIP, seeks approval to pursue such claim on behalf of the Debtor's estate.  The Trustee filed a response to the objections on January 27, 2010.  In his response, the Trustee counters that even if the LeMond Group cannot be forced to accept a money satisfaction under § 363(f)(5), the Trustee can nevertheless sell the Family Compound under § 363(f)(4) because the LeMond Group's claim is subject to a bona fide dispute.

Before reaching the merits of the parties' respective arguments under § 363(f), the Court must first determine whether the Trustee's proposed process leading up to any sale is fair.  The parties in this case recognize that proposed bid procedures should enhance bidding and maximize sale proceeds.  The Trustee's proposed bid procedures do not satisfy such goals.

The Trustee, citing COLLIER ON BANKRUPTCY and *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D.Cal. 1985), contends that "where it appears from a review of all the facts and circumstances that a sale is in the best interest of the estate, a court will not disturb the trustee's business judgment regarding the terms of the proposed sale absent some compelling reason to do so."  The Trustee's reference to *Canyon Partnership* is interesting because in that case, the trustee employed an experienced real estate brokerage house to assist with the trustee's marketing efforts and the trustee also presented testimony at the sale hearing as to the value of the property at issue through an expert real estate appraiser.  In addition, the court in *Canyon Partnership* found that the general non-insider unsecured creditors would in all likelihood be paid in full.  *Id.* at 524.  Based upon the foregoing, the court found the "Trustee's testimony concerning the marketing difficulties associated" with the debtor's real property was meritorious

17

Created by Neevia Document Converter trial version http://www.neevia.com

and thus approved the Trustee's proposed sale of the property at a price that was roughly 70% of the property's liquidation value. *Id*. at 525.

This case is distinguishable from *Canyon Partnership*. Here, the Court cannot give "deference" to the Trustee's "exercise of business judgment." First, the Trustee failed to produce any credible evidence as to the value of the Family Compound. The Trustee's personal opinion concerning the value of the Family Compound is based solely on information obtained from the prospective purchaser, CIP. The Trustee has made no independent effort to ascertain the value of the Family Compound. The Court fully appreciates the Trustee financial predicament, but it would cost the Trustee little or nothing to obtain a real estate broker's independent opinion of value. It would similarly cost the Trustee little or nothing to familiarize himself with the real estate market in the Yellowstone Club area. Given the potential importance of this one asset to this bankruptcy estate, the Court was deeply troubled when the Trustee testified that he was wholly unaware that there may have been up to $40 million of sales in the Yellowstone Club during the Holiday season. $40 million of sales is certainly in stark contrast to the Trustee's testimony that real estate sales in the Yellowstone Club area are flat.

Second, the Court sees no benefit to the Trustee or Debtor's estate in limiting notice of the proposed sale to only those parties involved in this case. The Trustee attempts to justify his request for limited notice on grounds that CIP is the only party who has expressed an interest in the Family Compound. The record shows that the Trustee is the one who originally reached out to CIP. If the Trustee reached out to other potential purchasers through a robust marketing campaign, the Trustee might find that other unknown third parties might be interested in 160 acres of developable land. The Court doubts that many people would express a desire to

18

Created by Neevia Document Converter trial version http://www.neevia.com

purchase the Family Compound unless they knew it is for sale.  No one, including this Court or the Trustee, has any idea what interest might be generated by exposing the Family Compound to the market.  The Trustee could easily obtain the answer to such inquiry by listing the Family Compound for sale with a reputable real estate agent, at little or no out-of-pocket expense to the Trustee or the bankruptcy estate.

The Trustee suggested at the hearing that given the location of the Family Compound, within the confines of the Yellowstone Club, that it is really only marketable to CIP.  The Trustee has not presented any evidence to support such suggestion.  Indeed, while a prospective purchaser may not be able to secure membership to the Yellowstone Club, the Court can envision the property nevertheless being attractive to other developers given its close proximity to other available amenities such as those in the town of Big Sky, or those at Big Sky Ski Resort.

Finally, the bidding procedures proposed by CIP, as presented to the Court through the Trustee, involve a party that has, or at least had, very close ties with the Debtor and the Yellowstone Club.  In fact, while CIP does not own the Yellowstone Club, another entity under the control of Byrne does.  The Trustee's blind reliance on CIP's appraisal and seemingly blind acceptance of CIP's bidding proposal subjects the proposed bidding procedures to heightened scrutiny.  *See In re Biderman Indus. U.S.A.*, 203 B.R. 547, 549 (Bankr. S.D.N.Y. 1997) ("conduct of bankruptcy proceedings not only should be right but must seem right").  Where, as here, the proposed bidding procedures propose a sale to an entity with very close ties to the Debtor and the property at issue, before the Trustee has engaged an experienced broker and intensively explored non-insider proposals, and where the bidding procedures provide an expense reimbursement and other terms aimed at cutting off other competing bids, the business judgment

19

Created by Neevia Document Converter trial version http://www.neevia.com

rule simply does not apply.

If the Trustee wants to pursue a sale process and conduct a fair auction intended to find the highest and best offer for the Family Compound, the sale procedures should be as a bona fide auction – with procedures as transparent and as flexible as possible.  Specifically, the Trustee should formulate a proposal that encourages – and potentially rewards – all bidders to proffer their highest and best offers.

This Court previously cautioned in the Yellowstone Club bankruptcies, that "[t]he close relationship of the [Yellowstone Club entities], Edra Blixseth and CrossHarbor requires that this Court be particularly cautious about approving any bidding procedures that would favor CrossHarbor to the detriment of the other parties in interest in this case."  That same caution applies in this case and contrary to what Trustee argues, or at least as stated in the Motion drafted by CIP, the Notice of Sale is not "intrinsically fair."

This Court will not approve the Trustee's proposed bidding procedures and limited notice, particularly where the Trustee's valuation opinion is based solely upon information that is subject to scrutiny and where the Trustee seeks to sell the Family Compound with no marketing effort whatsoever.  Moreover, while the Trustee raised for the first time in his response that the LeMond Group's claim is subject to a bona fide dispute, the Court finds that CIP's claim may also be subject to a bona fide dispute.  However, this Court will not disturb the validity of either CIP's liens or the LeMond Group's lien unless the parties challenge the validity os such liens through an adversary proceeding as required by Rule 7001(2), F.R.B.P.

Resolution of all disputes, including the allegations raised by Western Capital Partners, may need to be resolved before anything can be done with this asset.  Because the Trustee is

Created by Neevia Document Converter trial version http://www.neevia.com

either unwilling or unable to pursue any action against CIP and because Western Capital Partners

states that Debtor has a claim against CIP that Western Capital Partners is willing to investigate

and prosecute on behalf of Debtor and the bankruptcy estate, the Court finds that allowing

Western Capital Partners authority to pursue such action against CIP is warranted.  *See e.g., In re*

*Valley Park*, 217 B.R. 864, 866 (Bankr. D.Mont. 1998), citing *Liberty Mutual Ins. Co. v. Official*

*Unsecured Creditors Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.)*,

207 B.R. 899, 903 (9th Cir. BAP 1997).  Because the Court is allowing Western Capital Partners

to pursue potential claims against CIP and its affiliates, it would be nonsensical for this Court to

also approve the Trustee's release and waiver of claims against CIP at this time.

　　　　The Trustee threatens that he will abandon the Family Compound if the Court denies his

motion to sell.  However, abandonment requires Court approval and if the Trustee fails to

convince this Court that the Family Compound is a burden to the estate, i.e. will provide no

benefit, the Court will not approve an abandonment of the Family Compound.

　　　　Given the inadequacies of the Trustee's proposed bidding procedures and the notice of

such procedures, the Court need not address the parties' arguments under § 363(f) and whether

*Clear Channel* applies.  The Court would note that neither the Trustee nor the objecting parties

have mentioned § 363(f)(2) or § 363(f)(3).  Perhaps with a little more negotiation between all the

parties, the Trustee might be able to formulate bidding procedures that would satisfy all parties.

In that instance, the Trustee could seek approval of a sale of the Family Compound free and clear

of liens under § 363(f)(2).

　　　　Finally, given the absence of opposition, the Court will grant CIP's request for relief from

the automatic stay as it relates to the property located at 18 King Edward Court, Rancho Mirage,

Created by Neevia Document Converter trial version http://www.neevia.com

California.  However, for the reasons discussed above, the Court will not grant CIP relief from the automatic stay at this time to proceed against the Family Compound.  By this Order, CIP will have obtained relief from the automatic stay with respect to three properties: 18 King Edward Court, 71361 Gardess Road and 71621 Gardess Road.  The combined value of such properties according to Debtor's Schedule A is $1,325,000.00.  The foregoing amount, in addition to the value assigned by this Court to Porcupine Creek of $73.5 million, together with the value of the Family Compound, whatever that value may be, convinces this Court that CIP is adequately protected at this time.

     In accordance with the above, the Court will enter a separate Order providing as follows:

     IT IS ORDERED:

     1.  The Motion of the Chapter 7 Trustee Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f) and  365, and F.R.B.P. 2002(a)(2), 6004 and 6006 for Order Approving the Sale of Real Property Known as "Family Compound at Yellowstone Mountain Club" Free and Clear of Liens, Claims, Interests and Encumbrances is DENIED without prejudice;

     2.  The Motion of the Chapter 7 Trustee for an order Approving Bidding Procedures and Authorizing the Trustee to Solicit Higher and Better Offers Pursuant to Proposed Notice of Sale is DENIED without prejudice;

     3.  The Trustee's Motion for an order Granting Relief From Stay on the Family Compound at Yellowstone Mountain Club is DENIED;

     4.  The Trustee's Motion for an order Granting Relief From Stay on Property Located at 18 King Edward Court, Rancho Mirage, California is GRANTED; and

     5.  Western Capital Partners request for authorization to file a complaint against CIP is

Created by Neevia Document Converter trial version http://www.neevia.com

GRANTED; and Western Capital Partners shall continue its review and investigation of Debtor's

Uniform Fraudulent Transfer Act claim against CIP and may seek to maximize the value of such

claim for the benefit of the bankruptcy estate, its creditors, and other parties in interest, by

pursuing such claim(s), including filing and prosecuting appropriate litigation against CIP and it

affiliates, on behalf of this bankruptcy estate.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

23