## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**EDRA D BLIXSETH**,

Debtor.

Case No. **09-60452-7**

## MEMORANDUM OF DECISION

At Butte in said District this 20th day of April, 2011.

In this Chapter 7 case the Trustee Richard J. Samson ("Samson") filed on January 26, 2011, a combined "Motion" (Docket Nos. 860-863; supplemented by Dkt. 910) to: (A) Approve the sale of real property known as the "Family Compound" at Yellowstone Mountain Club free and clear of liens, claims, interests and encumbrances under 11 U.S.C. §§ 105(a), 363, and 365; (B) to approve bidding procedures and authorize the Trustee to solicit higher and better offers pursuant to a proposed notice of sale; (C) to grant relief from the stay on the Family Compound to "stalking horse bidder" CIP Yellowstone Lending LLC ("CIP"); (D) to approve settlement of claims of the estate against CIP; and (E) for related relief. The Court conducted a hearing on the Trustee's Motion at Missoula on April 7, 2011, at which Samson appeared represented by counsel and testified. The only objection to the Trustee's Motion was filed by Timothy Blixseth ("Blixseth") on February 14, 2011 (Dkt. 882), and Blixseth was represented by counsel at the hearing in opposition. Other witnesses testified, and exhibits were admitted. At the conclusion of the parties' cases-in-chief the Court took the Motion under advisement. After review of the Motion, Blixseth's objection, the exhibits, record and applicable law, the Trustee's Motion will be granted for the reasons set forth below, and Blixseth's objections will be overruled.

1

This Court has jurisdiction of this Chapter 7 bankruptcy under 28 U.S.C. § 1334(a).  The Trustee's Motion to sell property of the estate and resolve claims is a core proceeding under 28 U.S.C. § 157(b)(2).  This Memorandum includes the Court's findings of fact and conclusion of law.

Samson appeared and testified at the hearing, represented by attorneys David B. Cotner ("Cotner") of Missoula, Montana, Hugh R. McCullough and Bradley R. Duncan of Seattle, Washington.  Blixseth was represented by Patrick T. Fox of Helena, Montana, and Christopher J. Conant ("Conant") of Denver, Colorado.  CIP was represented by attorneys Paul D. Moore ("Moore") and Barry Green of Boston, Massachusetts, and by Benjamin P. Hursh of Missoula. The Trustee's Exhibits ("Ex.") 1, 2, 4, 5, and 6, and Blixseth's Ex. 2 and 17, were admitted into evidence.  In addition the Court granted the Trustee's motion (Dkt. 898) to take judicial notice of testimony and exhibits admitted at a hearing held on June 7, 2010, in Case No. 09-61893, and this Court's Memoranda entered in Adversary Proceeding No. 09-00014 (Dkt. 575), and in Case No. 08-61570 (Dkt. 1025).  The Court also granted Blixseth's request for judicial notice (Dkt. 937) of motions, hearing transcripts, pleadings and other documents.

In addition to Samson, the Trustee called to testify at the hearing real estate broker Tim Murphy ("Murphy") of Hall & Hall of Bozeman.  Blixseth called Matthew E. Kidd ("Kidd") who is a principal in CrossHarbor Capital Partner's ("CrossHarbor") acquisition group, to testify in Blixseth's case-in-chief.

## FACTS

The Court provides the following "Background" from its Memorandum of Decision (Dkt. 636) entered on February 23, 2010, when it denied the Trustee's prior motion to sell the Family Compound:

# BACKGROUND

Timothy L. Blixseth ("Blixseth") and his former spouse, Edra Blixseth ("Debtor" [or "Edra"]), were the founders of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, which limited liability companies are referred to generally by this Court as the Yellowstone Club entities. Blixseth and Debtor were also the founders of Yellowstone Club World, LLC ("YCW"), Big Springs Realty, LLC ("BSR") and BLX Group, Inc., f/k/a Blixseth Group, Inc. or BGI. Blixseth and Debtor separated sometime in 2006 and Blixseth retained sole control of BGI, YCW, BSR and the Yellowstone Club entities from 2006 until August of 2008, when Debtor was awarded BGI, YCW, BSR and the Yellowstone Club entities as part of a marital settlement agreement. Debtor, on August 19, 2008, changed the name of BGI to BLX Group, Inc. ("BLX"). Also, in August of 2008, Debtor, at the suggestion of Samuel T. Byrne ("Byrne") and CrossHarbor Capital Partners ("CrossHarbor"), hired Discovery Land Company to manage and oversee the Yellowstone Club's operations, administration, design, construction, completion, maintenance, marketing, sales and all other day-to-day functions.

Under the marital settlement agreement between Debtor and Blixseth, Debtor was required to make various payments to or on behalf of Blixseth. To allow for Debtor to make such payments, CIP, on or about August 13, 2008, granted Debtor and BLX a 45-day loan in the original principal amount of $35 million (the "CIP Loan").[1] The CIP Loan was evidenced by two notes:

1. A Promissory Note in the principal sum of $13,000,000.00 made by BLX and Debtor to CIP; and

2. A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Debtor to CIP.

The CIP Loan is secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "CIP Deed of Trust") granted by the Debtor and BLX which purportedly encumbers property commonly known as 42765 Dunes View Road, Rancho Mirage, California (the "Porcupine Creek Property"), as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property and commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California. The Porcupine Creek property is owned by BLX. An appraiser,

---

[1] According to the Real Estate Purchase Agreement attached to the Trustee's Motion, the current amount owed CIP on the $35 million loan is at least $44,607,892 as of November 30, 2009.

3

Raymond L. Dozier, appraised the Porcupine Creek property at roughly $195,000,000 in October of 2007 and $128,000,000 in January of 2009.  In a memorandum of decision entered by this Court on October 2, 2009, in the BLX bankruptcy, the Court concluded that the "as is" impaired value of Porcupine Creek is currently $73,500,000.  In that same memorandum of decision and related order, the Court granted CIP relief from the automatic stay as to the two single family homes commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California.

The CIP Loan is also secured by real property commonly referred to as the 160-acre Blixseth Family compound ("Family Compound").  The 160-acre Family Compound is the subject of this Motion.

Of the $35 million CIP Loan, CIP retained $13,094,973.33 to payoff a loan that Blixseth and Kawish, LLC (an entity belonging to Blixseth) owed to CIP.  CIP also retained $225,000 for closing costs and $28,000.00 for pre-closing interest.  In addition, cash was paid out as follows:

| | |
|---|---|
| Title Insurance Premium/Costs | $102,012.80 |
| LeMond Title Insurance Premium/Costs | $13,540.00 |
| Owner's Policy Title Insurance Premium/Cost | $7,834.00 |
| LeMond Payment (wired directly to LeMond) | $8,000,000.00 |
| California Property Tax | $624,763.00 |
| Tim Blixseth Payment (wired directly to Blixseth) | $4,944,396.17 |
| Archer Financing Fee (wired directly to Archer Capital) | $200,000.00 |
| Borrower Proceeds | $1,016,477.28 |
| Commerce Escrow Fee | $18,000.00 |
| Federal Tax Lien | $2,176,779.22 |
| Borrower Counsel Fee | $500,000.00 |

Shortly thereafter, on November 10, 2008, Debtor caused the Yellowstone Club entities to seek protection under Chapter 11 of the Bankruptcy Code.[2]

---

[2]  Evidence in other cases suggests that Byrne proposed to Blixseth in the summer of 2008 that the Yellowstone Club entities file a "pre-packaged" bankruptcy to escape some of its financial difficulties.  Thus, it appears that the bankruptcy filings on behalf of the Yellowstone

Pursuant to the Yellowstone Club entities' confirmed Chapter 11 plan, YCLT is the successor-in-interest to Yellowstone Mountain Club, LLC and Yellowstone Development, LLC.

The Yellowstone Club entities comprise what is commonly referred to as the Yellowstone Club, an exclusive 13,000 acre plus master-planned residential and recreational community/retreat for members-only that targets individuals with high net worth. Byrne is the founder and managing member of CrossHarbor and is also a principal and co-founder of CIP and New CH YMC Acquisition, LLC. Byrne is also a member of the Yellowstone Club and both Byrne and CrossHarbor own substantial property within the Yellowstone Club.[3] In addition, CIP was the entity that eventually provided the Yellowstone Club entities with $19,750,000 of debtor-in-possession financing, and New CH YMC Acquisition, LLC acquired the bulk of the Yellowstone Club entities assets for $115 million in 2009 and is operating as the Reorganized Debtors.[4]

In addition, an involuntary bankruptcy petition was filed against YCW on January 25, 2009 (Case No. 09-60061), BSR filed a voluntary Chapter 7

---

Club entities may have been in the works for some time.

[3] Byrne purchased two Yellowstone Club lots in 2005. Byrne then made a bulk purchase in the Yellowstone Club in 2006 by taking over the 58 unit Sunrise Ridge Condominium Development for a price of $60 million. In August of 2007, Byrne purchased an additional 31 lots on the Yellowstone Club golf course at a price of $54 million.

[4] In approximately March of 2008, Byrne, through CrossHarbor, was proposing to purchase the assets of the Yellowstone Club for approximately $407 million. Byrne testified in other proceedings that his willingness to purchase the Yellowstone Club for approximately $407 million was based upon months of due diligence wherein Byrne and CrossHarbor spent millions of dollars. The proposed 2008 asset sale fell through, according to Byrne, for various reasons, including Blixseth's inability to accurately determine all the Yellowstone Club's liabilities and because Blixseth would have had to pay money to close the sales transaction as the Yellowstone Club's liabilities exceeded its assets. In the Yellowstone Club entities' bankruptcy, CrossHarbor proposed a stalking horse bid of $100 million under circumstances that provided fairly generous protections to CrossHarbor if it was not the successful bidder, including a $2.0 million breakup or termination fee, plus actual expenses up to $1.0 million incurred subsequent to November 10, 2008. In the Yellowstone Club bankruptcies, CrossHarbor sagaciously positioned itself to purchase the Yellowstone Club at a price that was drastically less than what it was willing to pay for the Yellowstone Club only 12 to 24 months prior. The only other party seriously interested in bidding on the Yellowstone Club was the first position lien creditor, Credit Suisse. In the end, CrossHarbor acquired the Yellowstone Club for $115 million–a mere 28% of what it originally agreed to pay for the Yellowstone Club in 2008 following extensive due diligence.

bankruptcy petition on June 5, 2009 (Case No. 09-61079), and an involuntary Chapter 11 bankruptcy petition was filed against BLX on September 21, 2009 (Case No. 09-61893).  Debtor filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009.  Debtor's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Richard J. Samson was appointed the Chapter 7 Trustee.

Debtor filed her Summary of Schedules, Schedules and Statement of Financial Affairs on April 29, 2009.  Debtor's Summary of Schedules reflects that Debtor's assets have a total value of $106,981,315.00, while Debtor's liabilities total $157,720.567.07.  With respect to real property, Debtor's Amended Schedule A filed June 12, 2009, identifies the following:

| Description of Property | Current value | Amount of secured claim |
| --- | --- | --- |
| 185 ANDESITE RIDGE ROAD, BIG SKY, MONTANA.  MORE PARTICULARLY DESCRIBED AS FOLLOWS:  LOT 48, OF YELLOWSTONE MOUNTAIN CLUB SUBDIVISION, PHASES 1 AND 2, IN MADISON COUNTY, MONTANA, ACCORDING TO THE OFFICIAL PLAT THEREOF ON FILE AND OF RECORD IN THE OFFICE OF THE CLERK AND RECORDER, MADISON COUNTY, MONTANA. (PLAT REFERENCE IN BOOK 4 OF PLATS, PAGE 408, RECORDS OF MADISON COUNTY, MONTANA) | $7,200,000 | $6,199,418.07 |
| FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB PHASE 1 & 2, SECTION 7, TOWNSHIP 7 SOUTH, RANGE 3 EAST, LOT 1A, AMENDED COS 7/1544, MADISON COUNTY, MONTANA (2 SMALL GUEST CABINS AND 160 ACRES) | $20,000,000 | $20,000,000 |
| 18 KING EDWARD COURT, RANCHO, MIRAGE, CA | $650,000.00 | $650,000.00 |
| CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, #2304, BELLEVUE, WA | $2,000,000 | $2,000,000 |
| CONDOMINIUM LOCATED AT 76620 HOLLYHOCK DRIVE, PALM VALLEY, CA | $150,000.00 | $150,000.00 |
| 42391 RANCHO LAS PALMAS, UNIT 23, RANCHO MIRAGE, CA | $100,000.00 | $100,000.00 |
| 71361 GARDESS ROAD, RANCHO MIRAGE, CA PROPERTY IS OWNED BY TIM BLIXSETH AND EDRA BLIXSETH AS JOINT TENANTS | $375,000.00 | $375,000.00 |

6

71621 GARDESS ROAD, RANCHO MIRAGE, CA         $300,000.00    $300,000.00

On July 16, 2009, creditor One Lincoln Tower was granted relief from the automatic stay to proceed against Debtor's "CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, #2304, BELLEVUE, WA" and on October 26, 2009, Western Capital Partners was granted relief from the automatic stay with respect to the same property.  Thereafter, on November 5, 2009, the Court entered an Order authorizing the Chapter 7 Trustee to sell the Bellevue condominium.

The Family Compound is relatively flat, developable land situated in the heart of the Yellowstone Club, between the lodge area and the golf course. Improvements on the Family Compound include a residential unit with an attached guest house.  In approximately April of 2008, while Blixseth owned the Family Compound, CrossHarbor secured preliminary plat approval from the Madison County Board of Commissioners for 40 development units at the Family Compound.  CrossHarbor's efforts in obtaining final plat approval of 40 development units were made in conjunction with CrossHarbor's efforts to purchase the Family Compound from Blixseth for $56 million in as late as June of 2008.  CIP did not inform the Trustee of its prior agreement with Blixseth to purchase the Family Compound.  The Trustee testified that he only learned of the prior purchase agreement between CrossHarbor and Blixseth during discussions with Blixseth in July or August of 2009.  The Trustee later learned more about the prior purchase agreement when the LeMond Group raised the matter in their objection to the Trustee's pending Motion.  To date, none of the parties have secured final plat approval for the 40 development units.

The Trustee states that the Family Compound is allegedly subject to a variety of liens and encumbrances that total in excess of $48.5 million.  The Trustee's Exhibit 2 is a schedule from a title report.  Exception 5 is the $56 million Purchase and Sale Agreement between Blixseth and CIP dated August 28, 2007.  Exception 6 is $13 million of the CIP Loan, exception 7 is an obligation owed to the LeMond Group, exception 8 is the other $22 million of the CIP Loan. Western Capital Partners, LLC, does not have a secured interest in the Family Compound, but is an unsecured creditor of Debtor's estate.

The Trustee did an initial evaluation of the Family Compound, including the three major liens of CIP and the LeMond Group.  The Trustee testified that he had a hard time determining the value of the Family Compound because of the real estate market decline in 2008.  In approximately July of 2009, the Trustee commenced discussions with CrossHarbor and the Yellowstone Trustee about the Family Compound.  Those discussions broke down in August of 2009, but the Trustee again renewed the discussions with CIP in September of 2009.  In approximately October of 2009, the Trustee and CIP reached a "verbal agreement" whereby CIP agreed to purchase the Family Compound from the

7

Trustee.  That verbal agreement is the basis for the Motion before the Court today.

Debtor's bankruptcy estate is not generating any income and the Trustee has not been able to liquidate any assets for the benefit of the estate.  Thus, the Trustee does not have any money to pay for an appraisal of the Family Compound.  However, CIP had an appraisal of the Family Compound done in June or July of 2009.  Based upon discussions with CIP and after reviewing CIP's appraisal, which CIP made available to the Trustee, the Trustee believes that the Family Compound is worth approximately $8 million.

CIP proposes to be a stalking horse bidder for the sale of the Family Compound under the terms set forth in the Real Estate Purchase Agreement filed December 18, 2009, at docket entry no. 576.  CIP's stalking horse bid of $8.5 million consists of an $8 million credit bid and a $500,000 cash carve-out.[5]  The $500,000 is intended, in part, to reimburse the estate for its time and effort in facilitating a sale of the Family Compound.  As explained by the Trustee, CIP has agreed to pay $500,000 in exchange for the Trustee's accommodation to sell the property free and clear of liens.  Under a sale free and clear of liens, CIP could move forward without having to go through State court foreclosure proceedings, thus eliminating any rights of redemption that other parties may have.

The $500,000 is also an accommodation for the Trustee's release of all claims against CIP.  The Trustee's Motion, which was drafted in large part by CIP, provides in paragraphs 15 and 16:

15. In consideration of CIP joining in this Motion and agreeing to the Real Estate Purchase Agreement and providing a Carve-out for the benefit of the Debtor's estate, the Trustee acknowledges and agrees that the Loan and all the liens created thereby are valid, legal, binding and enforceable obligations of the Debtor; that there are no defenses, offsets, or counterclaims of any kind with respect thereto; that as of November 30, 2009, the amount outstanding under the Loan was $44,607,892 and that interest at the rate of 15% was accruing thereon; no portion of the Loan is subject to avoidance, recharacterization, recovery, subordination or other challenge under the Bankruptcy Code, other applicable law or otherwise; and that the liens and security interests granted under the Loan Documents are perfected, enforceable first priority liens on and security interests

---

[5]  Under the terms of the Real Estate Purchase Agreement, the term "Carve-out' "means five hundred thousand United States Dollars ($500,000.00), which constitutes that portion of the Purchase Price which: (1) Buyer shall not be permitted to include in its Credit Bid; and (2) will not be subject to the Liens."  The terms "Liens" is defined as "all of [CIP's] duly perfected security and mortgage interests in the Property arising under or in connection with the Loan Documents."

in the collateral (other than the Third Mortgage and Security Agreement, which is a perfected, enforceable third priority lien on and security interest in the collateral) and are not subject to avoidance, recharacterization, subordination or other challenge. Further, the Trustee hereby releases CIP from all claims, rights, damages and causes of action arising on or before the date hereof relating in any way to the Loan, the Property or the Loan Documents.

16. Trustee acknowledges, and agrees not to object to, contest, or otherwise challenge, or support the challenge of, the amount, validity, perfection, priority and/or enforceability of (I) the Loan, (ii) the Loan Documents, (iii) any of CIP's security and/or mortgage interests in the Property and/or any other collateral granted under or in connection with the Loan Documents and/or (iv) the Obligations.

The Trustee testified that at the time he reached a verbal agreement with CIP in October of 2009, release of all claims was not part of the deal. The Trustee did not learn of the release issue until sometime in November of 2009 when CIP provided the Trustee with the first draft of the Real Estate Purchase Agreement.

When the Trustee first learned that CIP wanted him to release all claims against CIP, the Trustee undertook "a close scrutiny of the background of all the information – the notes, everything that transpired – that led to the liens on the Family Compound that were held by CIP[.]" According to the Trustee, he looked at whether CIP's liens against the Family Compound were avoidable transfers. The Trustee testified that he also examined other possible and potential claims, but did not identify the nature of the other claims examined. The Trustee concluded that funds of at least $26 million of the $35 million loan were used by Debtor for her personal benefit based on obligations that she assumed under her marital settlement agreement with Blixseth. The Trustee thus ascribed no value to the releases.

Under the proposed Notice of Sale, any competing bid to CIP's stalking horse bid had to be no less than $9,000,000.00 to cover the $8 million credit bid, the $500,000 carve-out, $250,000 for a termination fee to CIP, plus all out of pocket expenses incurred by CIP in pursuing the acquisition of the Family Compound not to exceed the sum of $150,000 in the aggregate. CIP agreed at the hearing to waive the $250,000 termination fee, and thus any competing bid would now be $8,750,000.00.

The Trustee seeks to limit service of his pending Motion and Notice of Sale to:

the Debtor, the Debtor's twenty largest unsecured creditors, the Office of the

9

United States Trustee, all parties who are known to the Debtor to claim interest in or liens upon the California Property and all parties having filed notices of appearance pursuant to Fed. R. Bankr. P. 2002. The Trustee will cause the Notice of Sale to be served upon all of the foregoing entities; all parties who are known to the Debtor to claim interests in or liens upon the Property; all governmental units, including taxing authorities who have, or as a result of the sale of the Property may have, claims, contingent or otherwise, against the Debtor in connection with the Debtor's ownership of the Property; all creditors; and all entities that have expressed to the Trustee an interest in purchasing the Property.

The Trustee explained that he has not attempted to market the property because he does not believe the Debtor has any equity in the Family Compound. The Trustee also has no plans to market the property going forward or to retain a real estate broker and has no plans to advertise the Family Compound.  The Trustee believes that the only persons interested in the Family Compound are those parties involved in this case.

The Trustee contends that an immediate sale is necessary because of the ongoing expense to the estate of keeping the property.  For instance, the Trustee has not been able to pay the real property taxes on the property.  The Trustee is similarly financially unable to insure the structures on the Family Compound. However, CIP has the two dwellings on the property insured at a value of $2 million.  The Trustee also testified that the estate is incurring ongoing monthly bills of $750.00 to $1,000.00 for heat and snow removal at the Family Compound. The Trustee, however, conceded that he is not paying the monthly costs out of pocket as those are costs that can be surcharged against the property under 11 U.S.C. § 506(c).  The Trustee summarily concluded that he does not see any potential of selling the property for a sum in excess of the three major liens because he has "not been contacted or had any communication from anyone with an interest in purchasing the property[.]"

Dkt. 636.

The Trustee's prior motion to sell the Family Compound was opposed by creditors

Western Capital Partners, YCLT and by the LeMond Group, which objected to CIP's first

stalking horse bid of $8.5 million as unreasonably low and because the proposed bid procedures

did not encourage competitive bidding.  The Court sustained the objections and denied the

Trustee's prior motion because the Trustee failed to produce any credible evidence as to the

value of the Family Compound, such as a real estate broker's independent opinion of value, and because the Trustee was unaware of $40 million of sales in the Yellowstone Club during the holiday season when the Trustee testified that real estate sales in the Yellowstone Club were flat. Dkt. 636. The Court also denied the Trustee's prior notice because of the Trustee's limiting notice of the proposed sale to only those parties involved in the case, when the Trustee could easily learn about interest in the Family Compound by listing it with a reputable real estate agent. Because of the Trustee's blind reliance on CIP's appraisal and blind acceptance of CIP's bidding proposal, the Court rejected the Trustee's business judgment with respect to the prior proposed sale of the Family Compound and denied his prior motion. Dkt. 636.

**Contentions of the Parties.**

In the instant Motion Samson proposes to cure the reasons why this Court denied his first motion to sell the Family Compound. CIP's stalking horse bid for the Family Compound has been increased to $10,850,000, including an increased cash component of $850,000 payable to the estate, and the Motion proposes to sell the Family Compound to the highest bidder after exposing the Family Compound to the market and if necessary at auction. This time, the Trustee argues, "everyone" will get notice. CIP still agrees not to seek a break-up fee or expense reimbursement, and the initial overbid has been reduced to $250,000. In the event of an overbid the sale would revert to an open outcry auction with $100,000 minimum bid increments.

This second sale is part of the settlement between the Trustee and CIP of potential claims of the estate, arising from claims asserted by Western Capital. The Trustee contends that releasing claims against CIP is appropriate in his business judgment, after his investigation and conferring with counsel for the estate, in the context of and in conjunction with his sale of the

11

Family Compound which will yield $850,000 in cash to this insolvent estate, and that the settlement satisfies the requirements of *In re A&C Props*, 784 F.2d 1377, 1381 (9th Cir. 1986) for approval of a settlement.

The Trustee argues that CIP has a first and third mortgage against the Family Compound totaling almost $19 million, that the estate has no funds to pay accruing taxes, fees, insurance and other administrative costs of the Family Compound, that he has received no other serious offers, and that the instant Motion and bidding procedures cure the defects which prompted this Court to deny the Trustee's first motion. The proposed settlement will admit the validity of CIP's loans and liens against the Family Compound, release CIP and its affiliates from all claims relating to its loans. The settlement includes granting relief to CIP from the automatic stay, but CIP agrees not to seek immediate relief from the stay with respect to the Family Compound to allow this sale and settlement to go through.

The Trustee's attorney explained at the hearing that, upon approval of the agreement with CIT, CrossHarbor will pay the estate $500,000, and upon closing of the sale CIP will pay the estate another $350,000 cash. If CIP is not the successful bidder it would get a $500,000 refund but the estate would retain $350,000, and would receive another $850,000 from the successful bid.

Blixseth objects on several grounds and requests that the Court equitably subordinate CrossHarbor's debt under 11 U.S.C. § 510(c)(1) because of CrossHarbor's "inequitable, greedy, fraudulent, bad faith and overreaching undisputed conduct" towards Edra and her creditors. Blixseth argues that he is a creditor based on his marital settlement agreement with Edra, and that he is listed as a disputed creditor in the Debtor's Schedules. Blixseth contends that the Trustee

failed to satisfy the *A&C* factors for approval of the settlement.  He contends that most if not all

of the $850,000 carve-out will go the Trustee's and his attorneys' fee and expenses, with no

benefit to the creditors shown.  He argues that CrossHarbor's secured debt has been satisfied

through foreclosure of cross-collateralized loans, and the settlement should not agree that

CrossHarbor's first and third liens are valid and allow CrossHarbor a $10 million credit bid

based on its liens.  Blixseth objects that the Trustee has not had a professional appraisal done on

the Family Compound, that CrossHarbor offered Blixseth $56 million for the Family Compound

in June of 2007, and that the Trustee's Motion fails to include the real value of the Family

Compound by failing to include the rights to develop residential units on it[6].

The Trustee replies that he and CIP are proceeding in good faith, and argues that

Blixseth's accusations of conspiracy as not credible.  The Trustee also argues that Blixseth has

not filed a proof of claim in this case, and that any claim he files now would be tardy and would

stand at the end of a very long line of very large claims.

**Witness Testimony.**

**1. Tim Murphy**

Murphy is employed by Hall & Hall of Bozeman, a real estate firm, as a real estate

broker.  Hall and Hall was employed by the Trustee, along with PureWest, Inc. ("PureWest"), the

southwest Montana affiliate of Christie's Great Estates ("Christie's"), after amended application

by Order entered on April 1, 2011 (Dkt. 931), for the purpose of marketing and assisting the

---

[6]Blixseth recognizes that CrossHarbor purchased the development rights to the Family
Compound when it purchased the Yellowstone Club.  Dkt. 882, pp. 14-15.  But he asks that
CrossHarbor be forced to assign the development rights to the estate or contribute the Density
Units for inclusion in any sale allowed.  Dkt. 882, p. 17

Trustee in the sale of the Family Compound[7].  Murphy testified that the Trustee's proposed auction sale of the Family Compound is the best way to establish and obtain the true fair market value of the Family Compound quickly.

Murphy testified that Hall and Hall's focus is large land sales, and that it affiliated with Christie's to utilize its expertise in high end properties.  He testified that Hall and Hall asked the Trustee for any appraisals and were given Ex. 1, an appraisal of the Family Compound prepared by Keith O'Reilly, MAI, of Bridger Appraisals Inc.  Ex. 1 fixed the value of the Family Compound as of as of 06/15/09 at $8,000,000.  Murphy testified as to his own opinion of the value of the Family Compound in a range of between $9,000,000 to $12 million, and he described CIP's $10.85 million stalking horse bid as a "good value."  He further testified that, if the Family Compound were sold with a Yellowstone Club membership, the range of values would increase to between $12 million to $15 million[8].

Under cross examination Murphy testified that he has shown properties in the Yellowstone Club since 2001.  He described the Big Sky, Montana, market as including Moonlight Basin, the Yellowstone Club and Spanish Peaks.  He testified that the Family Compound is a unique and "prime" property at the Yellowstone Club because of its location near the Lodge area, between the ski area and the golf course, and includes a creek.  Murphy testified that the problem in valuing the Family Compound is that the process requires a number of comparable sales to be accurate, and there is a small number of sales available at this time.

---

[7]Hall and Hall and the other Professionals are to be paid a flat fee of $50,000 payable solely from the cash component of the successful bid for the Family Compound.  Dkt. 930.

[8] No evidence, however, exists in the record that the estate property includes a Yellowstone Club membership to sell with the Family Compound.

Murphy described comparable properties in the vicinity including:  281 acres with no improvements listed for $16 million; a resale property of 357 acres now listed for $24.5 million which Murphy stated is overpriced; and a 160 acre tract on the back of the mountain which sold for $10.5 million on which Blixseth once announced that he would build the world's most expensive home.

Murphy testified that in the Spring of 2008, after the Wall Street collapses of Bear Stearns and Lehman Brothers, the real estate market "completely stopped."  He testified that there was a 90% decline in sales volume, and a 30% reduction in real estate values where values returned to values in 2003.

Murphy testified that no comparison property really exists to the Family Compound, and that Hall and Hall believes that an auction is the best way to reach the true fair market value quickly.  Because of the liens against the property held by CrossHarbor and the LeMond Group, Murphy testified, an attempt to market the sale without an auction would involve a short sale, in which the value would not reach the amount of the debt and the title would be clouded.

Murphy described the auction process which would be followed if the Trustee's Motion is granted.  First, Hall and Hall would engage in direct marketing to its and Christie's databases, including to all of the "Fortune 400" most wealthy persons.  Hall and Hall would direct market the Family Compound to all Yellowstone Club members, conduct internet marketing, and advertisement by direct mail, advertisement in the Wall Street Journal, and other direct marketing.  Murphy testified that, by the third week of May, 2011, the Family Compound will have been cleaned and be ready for showing.  Hall and Hall will have results from its direct marketing efforts and will post the auction schedule and procedure on its website.

Blixseth's counsel cross examined Murphy about the effect on his opinion of the value of the Family Compound if it was sold with the development rights to build 38 density units.  He testified that in 2007, when Blixseth sold the property for $56 million, that the land value was $1 million and the balance of the purchase price was based on the buyer's ability to get approval from the Yellowstone Club for 40 additional density units.  Murphy testified that CrossHarbor, not the estate, now owns any development rights and he has no knowledge of CrossHarbor's development plans for the Family Compound.  Murphy testified that if a purchaser could get development rights it would have a substantial effect on the value of the Family Compound, but that it would be worth less than $40 million based on the current values of smaller tracts.  He emphasized, however, that the development rights do not exist at present and are not property of the estate available for sale with the Family Compound.  That testimony is uncontroverted.

### 2.  Richard Samson, Trustee

Samson testified that, after his prior motion to sell the Family Compound was denied, he investigated the estate's claims against CrossHarbor/CIP, including the claims initiated by Western Capital against CrossHarbor.  Eventually, Samson "wrestled back" the claims from Western Capital, and Samson evaluated the claims in consultation with his attorneys.

Samson described the process he followed in evaluating claims against CrossHarbor.  He testified that he employed attorneys and other professionals, met with them, reviewed thousands of emails and documents, and attended meetings.  Samson attended a meeting in Denver with Western Capital over several days to discuss the claims against CrossHarbor, and met with representatives of CrossHarbor in Boston in November of 2010, and exchanged documents.  Significantly, Samson testified that the estate is administratively insolvent, and that the estate

16

lacks the resources to employ expert witnesses to litigate the claims against CrossHarbor.

Samson described the claims which are the subject of the instant Motion to sell and settle claims as two primary claims: (1) breach of fiduciary duty; and (2) a related equitable subordination claim against CrossHarbor. Samson testified that he considered a fraudulent conveyance claim, but that he concluded that the best claims for fraudulent conveyance belonged to a different bankruptcy estate, i.e., BLX. He testified that the fraudulent conveyance claims had been identified by Blixseth's attorney Flynn for Western Capital's complaint. Samson testified that he took Blixseth's allegations of conspiracy by CrossHarbor against the marital estate seriously, but that after his investigation he concluded that he did not believe that he could prevail on such a theory. Under cross examination, Samson testified that he considered a breach of contract claim for the estate against CrossHarbor, and that he discussed an unjust enrichment claim with his attorney Cotner. The Trustee has not pursued such claims.

Samson discussed Ex. 6, a letter from Edra to CIP and CrossHarbor dated August 3, 2008, showing cash in and cash out from a $35 million loan from CIP to Edra and Blixseth Group, Inc. Samson testified that Ex. 6 was part of his analysis of avoidance actions because it shows a loan secured by Edra's property. Ex. 6 shows that CIP advanced $30,951,775.80, except for $13,347,973.33 retained by the lender to payoff the loan from CrossHarbor to Blixseth, which Edra assumed in the marital settlement agreement, and paid closing costs and interests. Ex. 6 also shows "Cash Out" totaling $17,603,802.47. Samson testified that $13 million of the $35 million loan became CrossHarbor or CIP's first position lien against the Family Compound, $13.5 million owed to the LeMond Group became the second position lien, and the balance of $22 million ended up as CIP's third position lien. Trustee's Ex. 2 is part of a

17

title commitment which corroborates Samson's testimony of the three liens at item nos. 26, 27 and 28.

Blixseth's Ex. 2 is an "Agreement to Form" which applies to the $35 million loan from CrossHarbor to Edra and her entities. Samson admitted that the Agreement to Form evidences that CrossHarbor was entering into a fiduciary relationship with Edra, and was entering into a joint venture with respect to the club in which CrossHarbor was to raise $100 million in equity which it never raised. Blixseth's counsel elicited Samson's testimony set forth above regarding how CrossHarbor purchased the Yellowstone Club, including the development rights, for $115 million from the estate instead of the $455 million which Cross Harbor had contracted to pay in 2008, and how CrossHarbor had previously agreed to pay approximately $56 million for the Family Compound with the related development rights. Samson later testified that the estate has no development rights for the Family Compound, has no rights to the density units, and does not have a Yellowstone Club membership to sell with the Family Compound. CrossHarbor owns and controls the density units through its ownership of the Yellowstone Club. Under cross examination by counsel for CrossHarbor Moore, Samson testified that Blixseth agreed to sell the Family Compound to CrossHarbor for $1 million to $1.6 million of the $56 million contract in July 2007.

From his investigation of the liens and Ex. 6, Samson testified that he concluded that he was not comfortable pursuing a fraudulent transfer claim because Edra "absolutely" received a benefit in excess of CIP's first position lien, and that if fraudulent transfer claims existed they belonged to the BLX estate.

Next Samson described the fiduciary duty claims and equitable subordination claims

18

against CrossHarbor, his investigation, meetings and conferences which he and his attorneys had with CrossHarbor. Samson testified that the estate has colorable and viable claims against CrossHarbor for fiduciary duty and equitable subordination, but that they are "very difficult claims." Samson testified that the Debtor Edra would be a "key witness" with respect to litigating the estate's claims against CrossHarbor, but that she would be a "reluctant" witness. Samson explained that Edra told the estate's attorneys that she did not feel that she had been wronged by the actions or inactions of CrossHarbor. He did not feel that Edra would be a very powerful witness for the estate's claims against CrossHarbor.

On cross examination Blixseth's counsel asked Samson if he is aware of an arrest warrant issued for Edra issued by the U.S. District Court for the District of Colorado, and Samson testified that he is aware. Over objection, Blixseth's attorney stated that he was eliciting the testimony to impeach Edra's credibility and the reasonableness of Samson's reliance on Edra's statements in forming his opinions relative to the merits of the settlement of the estate's claim against CrossHarbor. Also related to Samson's reliance on Edra's statements, Blixseth's counsel asked Samson on cross examination if he was contacted by federal law enforcement officials regarding Edra. Samson answered that he was interviewed by federal authorities about Edra, in his capacity as Trustee, in a criminal investigation that Samson understood was precipitated by referrals made by Blixseth to federal authorities.

Another problem Samson testified about with respect to the estate's claims against CrossHarbor were the timing of the loans from CrossHarbor to Edra during the Summer of 2008. The loans were intended only to be short-term bridge loans, while Edra attempted to sell a property in France known as Chateau de Farcheville. Edra was unable to sell the property

because all sales halted in the market collapse in 2008, and she was unable to get long-term financing from Archer Financing to pay off CrossHarbor and went into default.  All sales halted in the market collapse of 2008.

With respect to CrossHarbor, Samson testified that the cost factor of the litigation against CrossHarbor was an important factor in his analysis because CrossHarbor and affiliates "are a well-heeled group," while he is the Trustee of an insolvent Chapter 7 estate.  Samson testified that his attorneys estimate that the cost of litigating the estate's claims against CrossHarbor to a conclusion would be between $750,000 and $1,000,000.

Samson concluded that the settlement with CIP and CrossHarbor, after his extensive investigation, and in his informed business judgment, is in the best interest of the estate and makes the most sense.  The § 363 sale of the Family Compound, Samson testified, "was kind of the springboard" for Samson to wrap up the settlement agreement with CrossHarbor.  Samson testified that it is his position that he could never sell the Family Compound for enough to pay all the secured claims against it, or even to pay the three liens held by CrossHarbor and the LeMond Group.  He estimated the total debt secured by liens on the Family Compound as "far in excess of $40 million."

Samson testified that he has initiated adversary proceedings to avoid some of the liens against the Family Compound, but that even if he is successful he does not believe there would be any equity available for the estate.  With respect to CrossHarbor, Samson estimated the current amount secured by its first position lien as $18 million to $19 million; LeMond Group's second position lien owed between $15 million or $16 million; and the total debt of just those two liens secured by the Family Compound at close to $35 million.  He testified that the interest

component alone of the debt owed to CrossHarbor and Lemond Group accrues at between $4 million to $ 5 million per year.

Samson testified that the stalking horse bid of $10,850,000 is a fair price, and that no break-up fee applies.  Ex. 5 includes as attached exhibits the proposed "Real Estate Purchase Agreement" (Ex. A) and "Trustee by Chapter 7 Trustee of Bankruptcy Sale of Real Property Known as the 'Family Compound at Yellowstone Mountain Club,' Deadline for Submitting Objections and Higher Offers and Hearing Date" (Ex. B).  Samson testified that any party wishing to overbid must put down $500,000 in cash, sign a real estate purchase agreement, and bid initially at $11.1 million.  If more than one qualified bidders meets the criteria then an auction takes place, with the Court's ultimate approval.  Samson testified that any interested party will learn about the sale from Hall and Hall's efforts, and can come forward if they wish. Under examination by the Court, Samson testified that the agreement provides for credit bidding, and that CrossHarbor has close to $19 million of credit bid available.

Samson testified that the "outside date" for closing the sale now is June 17, 2011, and if the matter is not resolved by then CrossHarbor would have the right to move for relief from the automatic stay and pursue foreclosure.  Samson testified that if the sale did not take place the estate would have to pursue the claims against CrossHarbor, but that he could not protect the Family Compound in the event CrossHarbor seeks relief from the stay to foreclose.

With respect to Blixseth's contention that CrossHarbor's secured claim against the Family Compound has been fully satisfied, Samson discussed Ex. 4, which he described as the trustee's deed upon foreclosure sale of Porcupine Creek to CrossHarbor/CIP.  Samson testified that as of the time of the sale of Porcupine Creek the amount of unpaid debt was $51,192,071.77.

21

Samson testified that CrossHarbor bid $35.1 million at the foreclosure sale to purchase Porcupine Creek, and that the difference is the balance remaining.  Samson testified that the $51,192,071.77 was cross-collateralized by both Porcupine Creek and the Family Compound. This evidence is uncontroverted.

With respect to Blixseth's objection about the Trustee's proposed distribution of the $850,000 carve-out, Samson testified that he is not trying to distribute any proceeds at this time, but is trying to accomplish settlement.  With respect to the benefit to creditors, Samson testified that the receipt of the $850,000 carve-out, for this insolvent estate, would give the estate some liquidity and enable him to pay his professionals and experts who he needs in other cases to conduct discovery and pursue recovery for the estate on other claims.  Samson testified that he cannot continue to ask the professionals employed by the estate to work without being paid as they have for two years.  On cross examination, Samson testified that the $850,000 carve-out was not allocated between the sale of the Family Compound and the settlement of the estate's claims against CrossHarbor.

Samson testified as a rebuttal witness at the conclusion of the hearing.  Samson testified that Blixseth made a verbal offer to Samson in October 2009 to purchase the estate's marital settlement claim against Blixseth, the claim against the Liner law firm, and claims against CrossHarbor and Western Capital for the total amount of $250,000.  Samson rejected Blixseth's offer.  Samson's rebuttal testimony is uncontroverted, and Blixseth did not cross examine Samson on rebuttal.

### 3. Matthew Edward Kidd

Kidd is a principal of the acquisitions group with CrossHarbor since February 2008.

22

Blixseth's counsel questioned Kidd about non-contract tort claims arising from CrossHarbor's alleged breach of the Agreement to Form, Blixseth's Ex. 2, which Kidd testified was a material part of the $35 million loan from CrossHarbor to Edra.

Ex. 17, titled "Discussions between Edra/YC Entities and CrossHarbor Capital Partners" discusses the short-term bridge financing to Edra.  At page 3 it states that CrossHarbor requires that it be provided with updated financial statements for the YC since 3/31/2008.  Kidd denied that CrossHarbor controlled distributions of the working capital, and testified that decisions were made between Edra and CrossHarbor regarding expenses to be paid from the working capital. Ex. 17 ends at page 11 with the statement "Early stage analysis indicates future net cash flow to EB of $600+ MM."

Kidd testified that as of 2008 and based on the assumptions at the time, CrossHarbor projected gross profits from developing the Family Compound of approximately $104 million. Kidd testified that he has not updated those projections, and that CrossHarbor has not determined what its plans are for the Family Compound if it is the successful bidder.  With respect to development on the Family Compound, Kidd testified that there was "some sort of preliminary plat that had expired and is no longer relevant" and that there is no approval for any development on the Family Compound.  Cross Harbor has not attempted to renew the application for development.

In a colloquy near the end of the hearing, Blixseth's attorney Conant stated that "CrossHarbor can do what it wants to do with the Family Compound[,]" but Blixseth objects to the Trustee's settlement with CrossHarbor, which counsel recognizes is part and parcel with the sale.  Dkt. 953 (Transcript, p. 194).  Conant concluded with an offer of proof that Kidd would

testify that CrossHarbor had the money to inject $100 million in capital to Edra, but did not

instead forced her and the Yellowstone Club into bankruptcy knowing that the Club had

undisclosed liabilities.  Then, Blixseth offered, CrossHarbor purchased the Yellowstone Club

from the estate for $115 million and made over $107 million profit[9].

## DISCUSSION

### I. Sale Free and Clear – § 363(f).

The Trustee moves for authority to sell the Family Compound other than in the ordinary

course of business under 11 U.S.C. § 363(b), and free and clear of liens, claims, interests and

encumbrances under § 363(f).  Section 363(f) authorizes sale of property under subsection 363(b)

free and clear of liens and interests, and provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free
> and clear of any interest in such property of an entity other than the estate, only if–
>
>> (1) applicable nonbankruptcy law permits sale of such property
>> free and clear of such interest;
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such property is to
>> be sold is greater than the aggregate value of all liens on such
>> property;
>> (4) such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable
>> proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re East Airport Development, LLC*, 443 B.R. 823, 830 (9th Cir. BAP

2011).

A leading commentator explains that since the language of § 363(f) is in the disjunctive, a

sale free and clear may occur if any one of the conditions of § 363(f) has been met.  3 COLLIER ON

---

[9]On behalf of CrossHarbor, attorney Moore objected to Conant's offer of proof as a
mischaracterization of testimony.

BANKRUPTCY, ¶ 363.06 (16th ed. 2010). CrossHarbor/CIP consent to the sale of the Family

Compound, so with respect to them § 363(f)(2) applies.

The LeMond Group objected to the Trustee's first proposed sale, but did not file an

objection or appear in opposition to the instant Motion, after notice. Likewise other lienholders

have not filed objections to the sale free and clear, and the Trustee's Motion was served on

several of the lienholders listed on Trustee's Ex. 2. This Court deems the lack of objection by

holders of liens and interests, after notice, as their implied consent to the sale free and clear of

liens. *FutureSource LLC v. Reuters Ltd*., 312 F.3d 281, 285 (7th Cir. 2002), *cert. denied*, 538

U.S. 962, 123 S.Ct. 1769, 155 L.Ed.2d 513 (2003).

Blixseth objects to the sale, but his attorney Conant admitted at the hearing that

Blixseth's objection goes mainly to the Trustee's Motion to approve the settlement of the estate's

claims against CrossHarbor/CIP. Conant conceded that if the sale does not take place

CrossHarbor will be able to get relief from the stay and proceed to foreclosure against the Family

Compound. While Blixseth does not consent to the sale, the sale free and clear may proceed if

his interests are the subject of a bona fide dispute.

Section 363(f)(4) permits a trustee to sell property without a creditor's consent, provided

the creditor's interest in the subject property is in bona fide dispute. "The purpose of § 363(f)(4) is

to permit property of the estate to be sold free and clear of interests that are disputed by the

representative of the estate so that liquidation of the estate's assets need not be delayed while

such disputes are being litigated." *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (9th Cir. BAP

2001). Samson testified that he is challenging the validity of liens and interests in the Family

Compound listed on the Trustee's Ex. 2, other than CrossHarbor's liens and the LeMond Group's

25

second lien, in adversary proceedings.  No evidence exists in the record to the contrary, so the Court finds that all holders of liens and other recorded interests in the Family Compound either consent to the sale, or that their liens and interests are the subject of a bona fide dispute and the Family Compound can be sold free and clear of their interests under § 363(f)(4).

The evidence shows that Blixseth does not have a lien or recorded interest in the Family Compound.  Trustee's Ex. 2.  Blixseth has not filed a Proof of Claim in this case, so he does not have an allowed claim.  He argues that Debtor's Schedule listed him as a creditor, but admits that his claim is listed as a disputed claim.  Therefore, the Court finds that Blixseth's interest is in bona fide dispute.  Next Blixseth contends that he is a creditor based on the marital settlement agreement.  Samson testified that part of the settlement with CrossHarbor and CIP is that CIP agrees to have all of its right, title and interest under the marital settlement agreement assigned to the Trustee, and Samson intends to pursue litigation against Blixseth regarding the marital settlement agreement.  Thus, all of Blixseth's conceivable interests in the Family Compound are subject to bona fide dispute, and the Trustee can sell the property under § 363(f)(4) notwithstanding his opposition.

Blixseth's other objections to the sale do not address the factors listed in § 363(f), and are related to his objections to approval of the settlement between the Trustee and CrossHarbor/CIP.  Although Blixseth has no allowed claim he objects to the sale because the $850,000 carve-out will be distributed to Samson and his professional rather than to unsecured creditors.  First, this objection is premature because Samson testified that he is not seeking any distribution of the $850,000 carve-out in the pending Motions at the present time.  No evidence exists to the contrary.  Second, the allowance of claims and administrative expenses, and the priorities which

26

claims and expenses have, are governed by statute set forth at 11 U.S.C. §§ 502, 503, and 507.

Blixseth argues that CrossHarbor's claims were fully satisfied by its foreclosure and sale of Porcupine Creek, and that CrossHarbor has no remaining liens on the Family Compound. Blixseth offered no witness testimony or exhibits in support of that argument. Samson and Murphy both testified that they investigated the claims and liens against the Family Compound, and that CrossHarbor retains a first and third lien against it. The title commitment in Trustee's Ex. 2 corroborates their testimony. Samson put the amount of CrossHarbor's debt secured by its liens at approximately $19 million. Accordingly, the Court finds that CrossHarbor has a first and third lien against the Family Compound, which the evidence shows gives CrossHarbor total secured claims in the approximate amount of $19 million.

The evidence shows that the estate has no equity in the Family Compound. CrossHarbor's stalking horse bid of $10,850,000 is not enough to pay the debt secured by CrossHarbor's liens, or the lien of the LeMond Group. Nevertheless, under the terms of the proposed sale the estate will receive at least the $850,000 carve-out in cash from CrossHarbor's stalking horse bid, and possibly more if the sale goes to auction. Without the sale, the evidence shows that CrossHarbor will seek relief from the stay to seek foreclosure against the Family Compound. Samson testified that he cannot stop CrossHarbor, and so if the sale is not approved the estate will receive nothing and the Family Compound will be lost to the estate.

Blixseth objects that the $10,850,000 stalking horse bid is far less than the $56 million which he argues CrossHarbor offered and contracted to purchase the Family Compound for from him in 2007. Blixseth is comparing apples to oranges, however, especially after the economic recession which took place in 2008. The evidence shows that the $56 million bid in 2007

included the development rights to develop 38 or 41 density units on the Family Compound.

Samson, Murphy and Kidd all testified that the estate does not own the development rights,

Cross Harbor controls them, and Blixseth offered no evidence to the contrary.  Murphy testified

that the 2008 recession stopped all sales activity and caused a major decline in sales values.

Therefore the Court finds that the $56 million sale offer in 2007 is irrelevant to the market

conditions existing now, and it involved significantly different assets than the Family Compound

which is the subject of the Trustee's Motion.

The Court denied the Trustee's prior motion to sell the Family Compound because of

insufficient notice, and the Trustee's failure to engage a real estate professional to ascertain the

value and market the property.  The Court finds that Samson has addressed the Court's earlier

concerns.  He employed Hall and Hall and its affiliates, experienced professionals, and those

professionals have created a detailed marketing plan for the Family Compound which includes

personal contacts, direct mailing, print advertising, and internet marketing which will expose the

Family Compound to a worldwide market of buyers with the capacity to bid for the Family

Compound.

The stalking horse bid of $10,850,000 is the opening bid.  In spite of Hall and Hall's

marketing plan it may turn out to be the only bid, but the bidding procedures ensure, to the extent

possible, that other qualified bidders may come in and submit competing bids.  In that event the

sale would proceed by public auction, after extensive notice and marketing, which the Court

finds gives the estate its best chance to realize the true and maximum market value of the Family

Compound for the estate.

Regardless of the results of the marketing and bidding procedures, under the Trustee's

Motion the estate is assured payment of the $850,000 carve-out, with an increased amount within the realm of possibility. The Trustee has heeded the Court's earlier admonitions, and the instant Motion cures the defects which prompted the Court to deny the Trustee's prior motion to sell. The Court finds that concludes that the Trustee's Motion to sell the Family Compound satisfies the requirements of § 363(b) and § 363(f), and that the sale of the Family Compound free and clear of liens and interests under the bidding and sale procedures set forth in the Trustee's Motion is in the best interests of creditors and the estate.

### II. Approval of Settlement.

The Trustee's Motion seeks approval of a settlement with CrossHarbor/CIP, and for waiver and release of CIP and its affiliates from any potential claims by the Debtor's estate. Blixseth objects to the settlement for the reasons discussed and rejected in the preceding section, i.e., that CrossHarbor's claim has been satisfied and the Trustee has failed to show how the $850,000 carve-out benefits unsecured creditors. In addition, with respect to the settlement of the estate's claims against CrossHarbor/CIP, Blixseth objects that the settlement should not be approved, and that instead the Court should equitably subordinate CrossHarbor's secured claims below the unsecured claims under § 510(c) because of CrossHarbor's inequitable conduct by inducing Edra to borrow $35 million with the promise of an additional $100 million of operating capital in the hope of realizing $600 million in profit, but withholding that $100 million. As a result, Blixseth argues, CrossHarbor forced Edra and Yellowstone Club into bankruptcy where CrossHarbor was able to purchase the Yellowstone Club for $115 million.

A proceeding to subordinate any allowed claim or interest is an adversary proceeding governed by Part VII of the Federal Rules of Bankruptcy Procedure. F.R.B.P. Rule 7001(8).

29

Blixseth's objection seeking equitable subordination of CrossHarbor's claim does not comport with proper procedure, and therefore this Court will not decide the merits of Blixseth's equitable subordination argument except in the context of approval of the proposed settlement agreement.

This Court addressed the test for compromise and settlement under F.R.B.P. Rule 9019(a) in *In re Schrock*, 9 Mont. B.R. 414, 416-417 (Bank. D. Mont. 1991) as follows:

> "Although the bankruptcy court has great latitude in authorizing a compromise, it may only approve a proposal that is 'fair and equitable.'" *Woodson v. Fireman's Fund Ins. Co.*, 839 F.2d 610, 620 (9th Cir. 1988) (Citing *Martin v. Kane (In re A & C Properties)*, 784 F.2d1377, 1380-81 (9th Cir.) *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed. 2d 122 (1986). In evaluating a settlement, the Court must consider:

>> '(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views of the premises.' *A & C Properties*, 784 F. 2d at 1381.

> *Woodson*, 839 F. 2d at 620 (additional citation omitted).
> *See also In re MGS Marketing*, 111 B.R. 264 (9th Cir. BAP 1990). In addition to the four prong test set forth in *A & C Properties*, it is also well established that the law favors compromise. *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976). In accordance with that principle, Bankruptcy Rule 9019(a) gives this Court broad authority to approve a compromise or settlement. *In re General Store of Beverly Hills*, 11 B.R. 539, 542 (9th Cir. BAP 1981). The determination of whether to approve a compromise or settlement is a matter within the sound discretion of this Court. *Providers Benefit Life Insurance Co. v. Tidewater Group, Inc.*, 13 B.R. 764, 765 (Bankr. N.D.Ga. 1981). *See also, In re Lions Capital Group*, 49 B.R. 163, 175-76 (Bankr. S.D. N.Y. 1985).

The first factor is probability of success in the litigation. Samson testified about his extensive investigation into the estate's possible claims against CrossHarbor, his employment of attorneys to investigate claims, his meeting with Western Capital Partners in Denver and a meeting with CrossHarbor in Boston, review of documents and emails. Samson testified that the

30

estate has viable, colorable claims against CrossHarbor based upon alleged breach of fiduciary duty and equitable subordination. Samson testified that he evaluated the possibility of other claims, such as fraudulent conveyance, breach of contract, and unjust enrichment, but that he concluded that those were not viable claims of this estate. He testified that a fraudulent conveyance claim might be available to a different bankruptcy estate, that of BLX.

While Samson felt that the estate has viable claims against CrossHarbor, he did not testify that the claims based on fiduciary duty and equitable subordination have a high probability of success, and neither did anyone else. Blixseth objects to settlement and wants the Trustee to pursue the claims against CrossHarbor, but he is not contributing any of the fees and costs required for litigation, and Blixseth did not call any witness who opined that the litigation has a high probability of success. Samson testified that the estate's claims against CrossHarbor were difficult claims, and that he has "no idea" whether the estate would prevail in such claims against CrossHarbor. He testified that CrossHarbor is well heeled and therefore able to mount a vigorous defense, while the estate by comparison is administratively insolvent.

Samson testified that Edra is a "key witness" for the estate to prevail on its claims against CrossHarbor, but that she is a "reluctant" witness who does not believe that she was wronged by CrossHarbor. Blixseth objects to the Trustee's reliance on Edra's statements in evaluating the prospects for success. Blixseth argues that Edra is not credible so Samson's reliance on her in evaluating the claims against CrossHarbor is not reasonable. As proof Blixseth offered evidence that Edra was held in contempt by the federal district court in Colorado, and that a warrant for Edra's arrest was issued. By so doing, Blixseth underscored Samson's evaluation of Edra as a problematic witness for the estate. If Edra's testimony is key to the success of the estate's claims

31

against CrossHarbor, Blixseth highlighted her weaknesses as a witness by offering evidence that she has been held in contempt of court and subject to an arrest warrant. If Blixseth is correct, then Edra may not be a credible witness in addition to being reluctant.

Recognizing that a risk always exists in litigation, based on the unequal resources of the insolvent estate and CrossHarbor, and the weakness and reluctance of the estate's key witness, Samson's testimony, and the lack of any witness testimony of a high probability of success from Blixseth, the Court finds that the estate does not have a high probability of success in the litigation against CrossHarbor. Samson testified that the estate's claims were viable, but he was cautious and would not predict a high probability of success. He testified that, therefore, in his business judgment the settlement was in the bet interest of the estate. There is insufficient evidence in the record suggesting otherwise to warrant this Court's interference with the Trustee's business judgment.

Blixseth objects that the estate could prevail against CrossHarbor and recover the hundreds of millions of dollars of profit it derived by its inequitable conduct towards Edra. Samson testified that he had a specific oral offer from Blixseth in October 2009 to purchase the estate's marital settlement claim against Blixseth, the claim against the Liner law firm, and claims against CrossHarbor and Western Capital, for the total amount of $250,000 which Samson rejected. That testimony is uncontroverted and suggests that the claims against CrossHarbor are not worth as much as Blixseth now argues. The Court finds and concludes that the first *A & C Properties* factor weighs in favor of settlement.

The second *A & C Properties* factor is the difficulties, if any, to be encountered in the matter of collection. The only evidence on this factor is Samson's testimony that CrossHarbor is

well heeled. Other than CrossHarbor's resources and ability to utilize normal legal defenses, there appear to be no difficulties to be encountered in the matter of collection. CrossHarbor owns or controls assets in Montana. The second *A & C Properties* factor does not weigh in favor of settlement.

The third *A & C Properties* factor to be considered is the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it. The Court finds that this third factor overwhelmingly and decisively weighs in favor of approval of the settlement. The background facts involving Edra's bridge loan from CrossHarbor, her inability to obtain other financing or sell the French property, the bankruptcies she initiated and subsequent developments which form the basis for the estate's colorable claims for breach of fiduciary duty and equitable subordination, are set forth in detail above. The Court concludes that the litigation is highly complex.

Samson testified that his attorneys advised him that the fees and expenses which would be incurred by the estate to bring the litigation against CrossHarbor/CIP to conclusion would be approximately $750,000 to $1 million. He testified that the estate is administratively insolvent, and that his professionals have not been paid. Given the estate's insolvency, no evidence exists in the record that the estate would be able to litigate the case to conclusion. With respect to inconvenience and delay necessarily attending the litigation, the Court assumes that CrossHarbor would defend the litigation zealously using its greater resources, and could delay the result as much as permitted by the Rules if it deemed it advantageous against the estate.

Blixseth objects to the settlement and argues that CrossHarbor's claims should be equitably subordinated because of its inequitable conduct. But Blixseth is not shouldering the

33

burden of paying the costs and expenses of the estate's litigation.  Samson's uncontroverted

testimony is that the estate is administratively insolvent and that the litigation will cost between

$750,000 and $1 million, which the estate does not have.  The Court finds and concludes that the

third *A & C Factor* weighs overwhelmingly in favor of approval of the settlement.

The fourth *A & C Properties* factor requires the Court consider the paramount interest of

the creditors and a proper deference to their reasonable views of the premises.  CrossHarbor is

the creditor with the largest secured claim against the Family Compound, and as a party to the

proposed settlement it consents.  The LeMond Group, the next largest creditor with a claim

secured by a second lien against the Family Compound, objected to the first proposed sale and

settlement but has not objected to the instant Motion to approve the settlement.  Samson testified

that the sale and settlement will bring the estate $850,000 in cash, which he described as liquidity

which will allow him to hire experts, conduct discovery, and pursue other claims with a higher

likelihood of recovering property for the estate for distribution to creditors.

Only Blixseth objects, but he has not filed a Proof of Claim so currently has no allowed

claim.  He is listed in Debtor's Schedules as having a disputed claim, and the Trustee testified

that as part of the settlement CIP is assigning its claims against Blixseth based on the marital

settlement agreement to the Trustee.  In short Blixseth's status as a creditor is uncertain, and any

claim he has sits at the end of the line.  Although Blixseth objects to the settlement, the Court

agrees with the Trustee that Blixseth's only hope of realizing any distribution on any claim he is

allowed in this case depends on the Trustee being able to pursue other claims for recovery, for

which the proposed settlement gives Samson resources to pursue.  The Court finds and concludes

that the fourth *A & C Properties* factor weighs in favor of approval of the settlement.

The first and fourth *A & C Properties* factors weigh somewhat in favor of settlement. The second factor weighs against settlement. The third *A & C Properties* factor weighs overwhelmingly in favor of settlement. The Court therefore concludes that the proposed settlement of the estate's claims against CrossHarbor/CIP is fair and equitable and satisfy Rule 9019(a).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 7 bankruptcy under 28 U.S.C. § 1334(a).

2. The Trustee's supplemented Motion to sell property of the estate, approve bidding procedures, for relief from the stay and to resolve claims is a core proceeding under 28 U.S.C. § 157(b)(2).

3. The Trustee satisfied his burden of proof under 11 U.S.C. § 363(b), § 363(f)(2), and § 363(f)(4), to permit the Trustee to sell the Family Compound at Yellowstone Club free and clear of liens, claims, interests and encumbrances. The proposed bidding procedures are fair and equitable and cure the deficiencies voiced by the Court in its earlier denial of sale.

4. The Trustee satisfied his burden under F.R.B.P. 9019(a) to show that the terms of the proposed settlement of the estate's claims against CrossHarbor/CIP are fair and equitable and in the best interests of creditors and the estate, after consideration of the four factors identified in *Martin v. Kane (In re A & C Properties)*, 784 F.2d1377, 1380-81 (9th Cir.), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed. 2d 122 (1986).

**IT IS ORDERED** separate Orders shall be entered in conformity with the above (1) overruling Blixseth's objection (Dkt. 882); and (2) granting the Trustee's Motion for Order approving sale of the Family Compound free and clear of liens, claims, interests, and

encubrances, approving bidding procedures and authorizing the Trustee to solicit higher and better offers, granting relief from the stay on the Family Compound, approving settlement of claims and granting related relief (Dkt. 860-863 and supplemented at Dkt. 910). The Court will enter Orders substantially in conformity with the proposed Orders attached to Dkt. 910 as Exhibits B and D; and will approve the "Notice by Chapter 7 Trustee of Bankruptcy Sale of Real Property Known as the 'Family Compound at Yellowstone Mountain Club,' Deadline for Submitting Objections and Higher Offers and Hearing Date" attached to Dkt. 910 as Exhibit C.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana